IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 1, 2022

IN RE CONNOR B.

**Appeal from the Chancery Court for Lincoln County**
**No. AD392    J.B. Cox, Chancellor**

_____

**No. M2021-00700-COA-R3-PT**

_____

This is the second appeal involving the termination of a mother's parental rights to her child. On remand after the first appeal, the trial court determined there were six statutory grounds for terminating the mother's parental rights and that termination was in the child's best interest. We conclude that the evidence was less than clear and convincing as to three of the grounds. But the record contains clear and convincing evidence to support the other grounds. The evidence is also clear and convincing that termination of the mother's parental rights is in the child's best interest. So we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON II, J., joined.

Jonathan C. Brown, Fayetteville, Tennessee, for the appellant, Virginia B.

Karla D. Ogle, Fayetteville, Tennessee, for the appellees, Taylor A. and Robert A.

**OPINION**

**I.**

**A.**

In April 2017, a juvenile court awarded Robert A. and his wife, Taylor A. (together "Petitioners"), legal custody of Robert A.'s half-brother, Connor B.[1] This followed the

_____

[1] The child's name is spelled both "Conner" and "Connor" in the record. Because our prior opinion used "Connor," we do the same.

filing of a petition alleging that the child was dependent and neglected in the care of his mother, Virginia B. ("Mother"). In its adjudicatory order, the juvenile court found, among other things, that the child, who was just shy of four years old, had serious dental problems. The child's teeth were black, and "[i]t [wa]s clear the child ha[d] not received needed dental care while in the care of [Mother]." The court also noted that the child had "a strange affection for smokeless tobacco (dip)" that could have only been developed while in Mother's care. Mother had recently been convicted of drug possession. And Mother admitted that "she would fail a hair follicle drug test for methamphetamine, Lortabs, and Xanax," although she claimed not to have "used methamphetamine in about a year."

On June 11, 2018, Petitioners petitioned to terminate Mother's parental rights.[2] As grounds for termination, they alleged: abandonment by failure to provide a suitable home; abandonment by failure to visit; abandonment by failure to support; persistence of conditions; and wanton disregard.

At first, Mother did not file a response to the petition. *In re Connor B.*, 603 S.W.3d 773, 776 (Tenn. Ct. App. 2020). And Petitioners sought a default judgment against her. *Id.* In response, Mother, through counsel, filed an answer, but Mother did not sign it as required by Tennessee Code Annotated § 36-1-117(o) (Supp. 2018). *Id.* at 777. Even after the trial court admonished Mother to cooperate with her counsel and to file an answer in compliance with the statute, Mother failed to comply. *Id.* So the court then entered a default judgment against Mother. *Id.*

The trial court also held a hearing in which only Petitioners, their counsel, and the guardian ad litem were present. *Id.* Following the hearing, the court entered a separate order terminating Mother's parental rights. *Id.*

On appeal by Mother, we held that the trial court properly granted Petitioners a default judgment. *Id.* at 784. But we vacated the termination of Mother's parental rights because "[n]o transcript of the evidence [wa]s contained in the record[ ] and the statement of the evidence approved by the trial court d[id] not adequately convey a complete account of the evidence presented during the termination hearing." *Id.* at 785-86. We remanded the case for a new evidentiary hearing on both the grounds for terminating Mother's parental rights and on the child's best interest. *Id.* at 786.

B.

On remand, the trial court heard testimony from Petitioners, Mother, and the manager of the halfway house where Mother lived. Petitioners testified to what prompted their dependency and neglect petition and the child's condition when he came into their

---

[2] Petitioners also sought to terminate the parental rights of the child's father. Because the child's father has not appealed, we focus on the facts as relevant to Mother.

home.  Taylor A. described seeing photographs in November 2016 of the child with a tobacco can in his back pocket and drinking beer.  Petitioners were also concerned that Mother was still breastfeeding the child while using drugs.  They could not find Mother or the child at Mother's last known address.  So they began searching for them.  After some effort, Mother and the child were found.  And Petitioners filed the dependency and neglect petition to gain temporary custody.  Connor began living with Petitioners in early December 2016.

When Connor first came to live with Petitioners, he had bronchitis and a double ear infection.  His teeth were rotted up to the gumline.  Taylor A. described the child's two front teeth as "like very thin toothpicks."  The child had "very puffy eyes, a shaved head, and he was always hungry."  Robert A. testified that Connor was malnourished and his clothes were loose-fitting.  He "just overall looked a little sickly."

Connor was also very, very aggressive.  He used curse words, raised his middle finger, and, at one point, choked Petitioners' one-year-old son.  Connor also had nightmares and both wet and soiled the bed.  Connor started therapy, but he would shut down and refuse to participate in the sessions.  It took about a year and a half for Connor to overcome these issues.

Petitioners also testified to Connor's current physical and emotional state and Mother's involvement with her child since the juvenile court granted Petitioners custody.  An oral surgeon pulled or capped and crowned the child's rotten teeth.  And the child's adult teeth were coming in healthily.  According to Robert A., Connor was now one of the biggest kids his age with beautiful front teeth and a nice haircut.

Connor calls Taylor A. "Mama" and Robert A. "Dad."  And the child relates to Petitioners' son as a brother.  Petitioners want to adopt Connor, which was their intention from the beginning.

Mother's last contact with Connor came in January 2017.  The juvenile court initially granted Mother visitation every other weekend from Friday at 6:00 p.m. until Sunday at 6:00 p.m.  But, as part of its dispositional order entered on April 11, 2017, the court granted an injunction at the request of the Tennessee Department of Children's Services prohibiting Mother from having contact with the child.  *See* TENN. R. JUV. P. 108(d).  The court found that Mother had made no progress with services and, "in fact, [Mother] ha[d] been arrested since the last court date for violation of probation."  Mother also had not participated in drug treatment or counseling as previously ordered.

Despite ordering Mother and the child's father to pay Petitioners $50 a week in child support, Petitioners testified that they received no support payments from Mother.  They did receive a check of approximately $1,200, which Mother acknowledged had been taken

3

from an IRS payment. Petitioners could not recall the date they received the check. Taylor A. also testified that Mother never sent any gifts to Connor.

Mother corroborated some of Petitioners' testimony while disputing other points. She admitted that, when Connor was removed, he had cavities under his two front teeth and that those teeth were "discolored." Mother claimed that she was unaware that her child was using tobacco. And, contrary to the juvenile court's finding, she blamed the child's use of tobacco on his father.

She denied that the child exhibited the other behaviors described by Petitioners, stating that "[h]e was all the way potty trained when [sic] the last time I s[aw] him." Mother surmised that it was the trauma of being removed from her care that might have caused the child's behaviors. Still Mother acknowledged that she was breastfeeding Connor when he was removed and that she "had tried once meth and Valium" during that period. Mother denied being a drug user. She also conceded that Connor would have witnessed fighting between her and Connor's father.

Mother admitted that her last contact with her child was in January 2017. She had not attempted to call because of the juvenile court's order prohibiting contact. And she had made no effort to seek revision of the court's order. She had also not sought visitation from any court. She attributed that failure to being in prison.

As for support, Mother claimed that she had made one or two support payments in addition to what was intercepted from the IRS. She explained that she was only required to pay a total of $1,800 in child support and that she "ha[d] paid $1,800, which [wa]s the required amount."

Mother also testified about her current circumstances. Since the petition to terminate parental rights was filed, Mother pleaded guilty to theft and forgery charges. She was incarcerated for approximately a year and a half. After her release in November 2020, she went to live in a halfway house. But she was "discharged" because she failed to return on time after being issued a pass to go to court. In January 2021, she moved to a halfway house in Nashville where she was currently living.

By the time of trial, Mother had been in the halfway house just shy of four months. She had started taking online college courses, studying medical healthcare, healthcare administration, and medical billing. Mother claimed to have "an A average" in her courses. Both Mother and the manager of the halfway house testified that Mother was also participating in Narcotics Anonymous and Adult Children of Alcoholics, a program that helps participants heal from childhood trauma. Mother was drug tested monthly by the halfway house, and she had not failed a test.

Mother received mental health care monthly. She suffered from depression, anxiety, and post-traumatic stress disorder. And she took prescribed medications for those issues.

Mother did not have a job, although she was searching for one. She was participating in Project Return, which aids felons with job readiness. As the halfway house manager explained, Project Return "either get[s] you a job or help[s] you find one." In the meantime, Mother was receiving some income. But the manager was unable to identify the source. The manager testified that Mother was current on her monthly $500 rent.

Mother conceded that she was not ready to take custody of her child. Among other issues, she had signed a contract to stay at the halfway house for a year. The manager testified that visitation by children was permitted at the halfway house and that there was space in the basement for that purpose. But Mother would not be able to have full custody of a child during the stay. Instead, Mother proposed that she be slowly integrated back into Connor's life, starting with visitation. Mother thought she would be ready to assume custody of the child within a year. And the manager testified that she could assist Mother with finding housing once she had custody.

Following the evidentiary hearing, the trial court again terminated Mother's parental rights. The court concluded that there was clear and convincing evidence to support six grounds for terminating: abandonment by failure to visit; abandonment by failure to support; abandonment by failure to provide a suitable home; abandonment by wanton disregard; persistent conditions; and failure to manifest an ability and willingness to assume custody or financial responsibility. The trial court also concluded there was clear and convincing evidence that termination of Mother's parental rights was in the child's best interest.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. The government's interest in the welfare of a child justifies interference with a parent's constitutional rights in certain circumstances. *See* Tenn. Code Ann. § 36-1-113(g) (2021).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are

5

shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

On appeal, Mother contends that Petitioners failed to prove the grounds for termination of her parental rights and Connor's best interests by clear and convincing evidence. In examining this contention, we apply the versions of the parental termination statutes in effect on the date the petition to terminate parental rights was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017) (holding "that the version of the statute in effect at the time of the [parental termination] petition's filing controls this action").

1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The parental termination statutes provide alternative definitions for "abandonment." *Id.* § 36-1-102(1)(A) (2017).

6

a. Abandonment by Failure to Visit and Support

One of the definitions of "abandonment" includes "the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights."[3]  *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i) (2017).  Here, because the petition to terminate parental rights was filed on June 11, 2018, the relevant four-month period is February 11, 2018, to June 10, 2018, the day before the petition was filed.  *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

To terminate parental rights on the ground of abandonment, the court must find the abandonment to be willful.  While the failure to visit or support presents a fact question, whether that failure is willful presents a question of law.  *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).  A "[f]ailure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so."  *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

i. Willful Failure to Visit

The trial court concluded that, during the four months preceding the petition to terminate, Mother had failed to visit the child.  This conclusion was primarily based on Mother's admission that she had not visited or inquired about the child since his removal in 2017 or filed a petition to regain custody of the child during that time.

Mother argues that her failure to visit was not willful because of the juvenile court's no contact order.  Our supreme court has stated that "a parent who attempt[s] to visit and maintain relations with his child, but [i]s thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child."  *In re Adoption of A.M.H.*, 215 S.W.3d at 810.

But an order suspending a parent's visitation rights does not "preclude a finding that [a parent] willfully failed to visit."  *In re Adoption of Angela E.*, 402 S.W.3d at 642.  Where, as here, the order includes conditions that would allow the parent to resume visitation, our courts have consistently held that a parent who makes no attempt to meet the conditions and seek visitation has abandoned the child.  *See, e.g.*, *In re Mac L.*, No. E2016-00674-

---

[3] As of July 1, 2018, parties seeking termination of parental rights no longer have to prove a parent's failure to support or to visit was willful.  2018 Tenn. Pub. Acts 1088.  Under the current version of the statute, the parent or guardian must raise and prove the defense of "absence of willfulness." Tenn. Code Ann. § 36-1-102(1)(I) (2021).

7

COA-R3-PT, 2016 WL 6876498, at *6 (Tenn. Ct. App. Nov. 22, 2016) (holding that father's failure to fulfill permanency plan steps to regain visitation was willful); *In re Riley C.*, No. M2015-00541-COA-R3-PT, 2016 WL 626058, at *7 (Tenn. Ct. App. Feb. 12, 2016) (holding that father abandoned his child by failing to take any affirmative steps to regain visitation during the relevant period); *In re Jaylah W.*, 486 S.W.3d 537, 552 (Tenn. Ct. App. 2015) (holding mother's failure to attempt to fulfill the court's conditions constituted a willful failure to visit); *In re Donald C.*, No. M2014-01327-COA-R3-PT, 2014 WL 7465684, at *6 (Tenn. Ct. App. Dec. 30, 2014) (holding mother's choice to not complete the required tasks to resume visitation constituted abandonment); *State Dep't of Children's Servs. v. J.A.H.*, No. E2005-00860-COA-R3-PT, 2005 WL 3543419, at *6 (Tenn. Ct. App. Dec. 28, 2005) ("Father's choice in refusing to cooperate in this regard constituted a willful decision to discontinue visiting his son.").

The trial court entered a no-contact order because Mother had made no progress with services and had not participated in drug treatment or counseling. The order concluded with a statement that Mother would be able to petition the court for a change in visitation. Mother admitted at the evidentiary hearing that she had made no attempts to petition the trial court for visitation. Her voluntary failure to act was willful. *See In re Audrey S.*, 182 S.W.3d at 863.

Based on this record, we conclude that the evidence was clear and convincing that Mother abandoned her child by willful failure to visit during the four months preceding the filing of the petition.

### ii. Willful Failure to Support

The trial court also found that Mother had abandoned Connor by failure to support based on the testimony that Mother had not made any support payments to Petitioners. The financial ability or capacity of a parent to pay support must be considered in determining willfulness. A parent's failure to support a child is not willful if the parent is financially unable to do so. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014) (citing *Pierce v. Bechtold*, 448 S.W.2d 425, 429 (Tenn. Ct. App. 1969)). In making a willfulness determination, the court must review a parent's means, which includes both her income and available resources for purposes of support. *See In re Adoption of Angela E.*, 402 S.W.3d at 641.

While the court accepted Petitioners' testimony that Mother failed to provide Connor with the court-ordered support during the relevant time period, there was scant evidence introduced regarding her ability to do so. Because there was insufficient proof of Mother's income and expenses, we conclude that the evidence was less than clear and convincing that Mother's failure to pay support was willful.

b. Failure to Provide a Suitable Home

A child has been abandoned under the second statutory definition of abandonment if the child has been removed from the home of a parent as a result of a petition filed in juvenile court, which ultimately results in a finding that the child was dependent and neglected, "the child was placed in the custody of the [D]epartment [of Children's Services] or a licensed child-placing agency;" and

> for a period of four (4) months following the removal, the department or agency made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but . . . the parent . . . ha[s] made no reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2017). The department's or the agency's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal." *Id.*

This Court has held that this ground does not apply to "a private action . . . that d[oes] not involve [the Department of Children's Services] or a licensed child-placing agency." *In re Jayden B.T.*, E2014-00715-COA-R3-PT, 2015 WL 3876573, at *9 (Tenn. Ct. App. June, 23, 2015), *perm. app. denied*, (Tenn. Sept. 25, 2015); *see also In re Steevie A.*, W2016-02577-COA-R3-PT, 2017 WL 6403887, at *10 (Tenn. Ct. App. Dec. 14, 2017), *perm. app. denied*, (Tenn. Mar. 9, 2018) (questioning whether ground applied when custody was transferred from the department to legal guardians shortly after removal); *In re Jarrell X.W.*, E2012-00380-COA-R3-PT, 2012 WL 6596157, at *10 (Tenn. Ct. App. Dec. 18, 2012) (concluding that statute did not apply when child was in the department's custody for only a few weeks before custody was transferred to guardian). Here, Connor was never in the custody of the Department of Children's Services. Petitioners asked that Connor be determined dependent and neglected. And he has been in their custody since his removal from Mother. And, while the juvenile court referenced Mother's refusal to avail herself of services in its 2017 final order granting Petitioners custody, the record includes no testimony from a representative of the Department of Children's Services or any other witness detailing services offered to assist Mother with finding a suitable home after Connor was taken from her custody.

We conclude that the ground of abandonment by failure to provide a suitable home was not applicable. But, even assuming that the ground was applicable, we conclude the evidence was less than clear and convincing that Mother abandoned her child by failure to provide a suitable home.

c. Wanton Disregard for the Welfare of the Child

The trial court also determined that the ground of abandonment by wanton disregard was demonstrated by the evidence. At the time the petition to terminate was filed,[4] the fourth definition of "abandonment" applied in cases in which the parent is incarcerated when the petition to terminate is filed or had been incarcerated within the four-month period preceding the filing of the petition and "contain[ed] two distinct tests for abandonment." Tenn. Code Ann. § 36-1-102(1)(A)(iv); *In re Audrey S.*, 182 S.W.3d at 865.

The proof presented at the evidentiary hearing does not establish that Mother was incarcerated at the time the petition to terminate was filed or for part of the four months preceding the filing of the petition to terminate. There was a great deal of testimony about Mother's extensive criminal history and her time in jail. But the proof only pinpoints the dates for one period of incarceration: between August 2018 and November 2020. This period fell after the petition to terminate was filed.

2. Persistence of Conditions

The trial court also found termination of Mother's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. This ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d at 555. Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions. When the termination petition was filed, the ground applied as a basis to terminate parental rights when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further

---

[4] This ground for termination was rewritten in 2020. 2020 Tenn. Pub. Acts 43.

10

abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3).[5] Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

This record contains clear and convincing evidence that the conditions preventing the child's safe return persist. Mother lacked an appropriate home at the evidentiary hearing. She lived in a halfway house, which was a mandated component of her release from prison. But Connor could not live in the halfway house with Mother.

We further conclude that the evidence was clear and convincing that there was little likelihood that these conditions would be remedied in the near future. Mother believed that she needed just another year to be able to take full custody of Connor. She had made some progress on her substance abuse and mental health issues. And she was taking steps toward educating herself and gaining employment. But she took these steps only after the filing of the petition to terminate.

Finally, we conclude that continuation of the parent and child relationship greatly diminishes the child's chances of an early integration into a safe, stable, and permanent home. Connor had been living with Petitioners for over four years. He was bonded with Petitioners, who provide a safe and stable home, and their son. And Petitioners want to adopt him.

3. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility

The trial court found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). But this ground was not alleged against Mother in the petition to terminate.

---

[5] This ground for termination was revised in 2018, effective shortly after Petitioners sought to terminate Mother's parental rights. 2018 Tenn. Pub. Acts 1088, 1089, 1104.

11

a. Notice and Implied Consent

Parental rights can only be terminated on grounds that were alleged in the termination petition. *See In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Notice is "a fundamental component of due process." *In re W.B.*, M2004-00999-COA-R3-PT, 2005 WL 1021618, at *13 (Tenn. Ct. App. Apr. 29, 2005) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); *State v. Pearson*, 858 S.W.2d 879, 884 (Tenn. 1993)). In the context of parental termination, due process requires that the parent be notified of the alleged grounds for termination. *In re Jeremiah N.*, No. E2016-00371-COA-R3-PT, 2017 WL 1655612, at *8 (Tenn. Ct. App. May 2, 2017).

This ground for termination was not pleaded. Even so, an unpleaded ground for termination may be tried by implied consent. *In re Adoption of Angela E.*, 402 S.W.3d at 640 n.3; *In re Alysia S.*, 460 S.W.3d 536, 564 (Tenn. Ct. App. 2014). We will find implied consent when a parent "knew or should reasonably have known of the evidence relating to the [unpleaded ground], did not object to this evidence, and was not prejudiced thereby." *Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 890 (Tenn. 1980).

We conclude that the ground of failure to manifest an ability and willingness to assume custody or financial responsibility was tried by implied consent. Mother did not object when Petitioners announced that they were proceeding against Mother on this ground. *See In re Anari E.*, No. M2020-01051-COA-R3-PT, 2021 WL 1828500, at *14 (Tenn. Ct. App. May 7, 2021) (finding implied consent when father did not object to petitioner's stated intent to proceed on unpleaded grounds); *In re Jeremiah N.*, 2017 WL 1655612, at *10 (finding unpleaded ground was tried by implied consent when father had notice "from at least the opening statement"). Nor did she voice any objections when Petitioners presented evidence in support of this ground. *See In re Allyson P.*, No. E2019-01606-COA-R3-PT, 2020 WL 3317318, at *9 (Tenn. Ct. App. June 17, 2020) (noting that "at no point during the trial did Mother object to any testimony or other proof offered with respect to [the unpleaded] ground").

b. Proof of the Ground

Under this ground, a parent's rights may be terminated if he or she

[1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). As to the first

12

prong, the petitioner may prove that a parent is either unable or unwilling to "assume legal and physical custody or financial responsibility of the child." *Id.* at 677.

We conclude that the evidence is clear and convincing that Mother was unable to assume custody and financial responsibility of her child. Mother had not seen Connor since January 2017. She had made no effort to petition any court to establish visitation after the juvenile court prohibited her from seeing him. And Mother conceded she was not ready for custody as of the date of the hearing.

The proof also showed that Mother had little understanding of what it would take to assume financial responsibility of her child. She thought that she had fully satisfied her child support obligation by the payment of $1,800, some of which had been taken from a tax refund. And the record reflects almost no employment history for Mother. Mother claimed that she had previous jobs, including as a real estate agent, and that she had owned her own business. Taylor A. recalled that Mother had previously testified to working at a factory of some sort. But Taylor A. did not remember Mother having any other jobs.

From February to June 2018, Mother worked for room and board as an in-home caretaker. And after the petition to terminate was filed, she worked as a confidential informant, earning $1,000. During other periods after Connor was removed from her custody, Mother was incarcerated. Mother was now a full-time student. When asked about her job prospects after she finished her studies, Mother thought, given her past criminal charges, she "will probably most definitely have to find a just whatever I can take [for] employment."

The evidence is equally clear and convincing that placing the child in Mother's custody would pose a risk of substantial harm to his psychological welfare. Connor has not seen Mother since January 2017. Petitioners testified that Connor did not remember Mother. Returning children to the custody of a virtual stranger carries a risk of substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020), *perm. app. denied*, (Tenn. 2020) (reasoning that returning the child to a "virtual stranger" in light of her strong bond with her current caregivers would constitute substantial harm). Even more concerning was how Mother failed to acknowledge her child's physical condition at removal and her own responsibility. In her testimony, Mother downplayed Connor's condition as well as her past drug use. And she disputed being responsible for the child's use of tobacco. Her testimony contradicted the findings of the juvenile court and suggested she never understood the risk of substantial physical harm posed by her own actions.

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not

always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis.[6] The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682. The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. The analysis should consider "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

After considering the statutory factors, the trial court determined that seven factors applied and concluded that termination of Mother's parental rights was in Connor's best interests. The first two statutory factors, which were found applicable by the court, look at the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible"). At the time of the evidentiary hearing, Mother was living in a halfway house after spending 18 months in prison. The halfway house did not permit a child to live full-time with a resident. Mother had made some changes. But they had been of short duration after years of drug use, criminal activity, and incarceration. She had yet to demonstrate that the changes would be lasting.

The court also applied the third and fourth factors, which concern the parent's relationship with the child. The third factor focuses on the consistency of visitation. *See id.* § 36-1-113(i)(3). The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4).

---

[6] Effective April 22, 2021, a court has a twenty-factor list to consider in determining a child's best interest. 2021 Tenn. Pub. Acts 509-11.

The court found, and Mother admitted, that she had not visited Connor since early 2017. Mother made no attempts to regain visitation through the court system. And, at the time of the evidentiary hearing, Mother had not seen the child in four years. Petitioners testified that the child did not remember her. There was no evidence of a relationship between Mother and the child.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The trial court found a change in caregivers would be detrimental to Connor given Mother's absence from his life.

The court also found the seventh factor applicable. That factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). The court found that Mother was still residing in a halfway house and that she was unable to have full-time custody of Connor until she completed her stay. The stay was contracted to last until at least until January 2022.

The ninth factor looks at the parent's child support history. *See id.* § 36-1-113(i)(9). The trial court found that Mother had not voluntarily paid the court-ordered child support to Petitioners. The evidence does not preponderate against this finding.

We agree with the conclusion of the trial court. The combined weight of the proven facts amounted to clear and convincing evidence that termination was in Connor's best interests.

III.

The record contains clear and convincing evidence to support terminating Mother's parental rights based on three of the six grounds relied on by the trial court: abandonment by failure to visit; persistence of conditions; and failure to manifest an ability and willingness to assume custody or financial responsibility of her child. The record also contains clear and convincing evidence that termination is in the child's best interest. So we affirm the judgment terminating Mother's parental rights.

s/ W. Neal McBrayer
W. NEAL MCBRAYER, JUDGE

15